## STATE v. EPHRAIM DAVIS.

*Common Design—Evidence—Judge's Charge—Accessory before the fact to murder.*

1. Where there is proof of an agreement between parties to commit a criminal offence, any statement made afterwards, and before the commission of the offence, by one of them in furtherance of the common design, is subject to proof and evidence against the others; so also, are the attending circumstances, such as appear in this case and constituting a part of the *res gestæ.*

2. The exceptions to the general rule that a party is bound by the answer of a witness as to a collateral matter, are; first, where the question put to the witness on cross-examination tends to connect the accused directly with the cause or the parties; and secondly, where the cross-examination is as to matter tending to show the motive, temper, disposition, conduct or interest of the witness towards the cause or parties.

3. If prisoner procures C to commit a robbery, and C kills the deceased to conceal the robbery, the prisoner is guilty as accessory before the fact to the murder.

4. The bill of indictment here is in the usual form, and sufficient.

(*State* v. *Patterson,* 2 Ired., 346, cited and approved.)

INDICTMENT for murder (removed from Alexander) tried at Spring Term, 1882, of CATAWBA Superior Court, before *Eure, J.*

The prisoner is indicted as an accessory before the fact to the murder of Caroline Thompson, as charged in the bill to have been committed by one Elijah Church.

Bill of indictment in substance: The jurors, &c., present that Elijah Church (now dead) late of the county of Alexander, not having the fear, &c, on the 10th of June, 1881, with force and arms, &c, in and upon one Caroline Thompson, in the peace of God and the state then and there being, feloniously, wilfully and of his malice aforethought, did make an assault, and that the said Church with a certain axe, which he held in both hands, then and there had and

held, the said Caroline Thompson, in and upon the head of her, the said Caroline Thompson, then and there feloniously, wilfully and of his malice aforethought did strike and beat, giving to her the said Caroline Thompson with the axe aforesaid in and upon the head of her, the said Caroline Thompson, several mortal wounds and bruises, of which said mortal wounds and bruises the said Caroline Thompson then and there instantly died. And further, that Church, the said Thompson in manner and form aforesaid, feloniously, wilfully and of his malice aforethought did kill and murder, contrary, &c. And further, that Ephraim Davis, late of the county of Alexander, before the said felony and murder was committed in form and manner aforesaid, to wit, on the 9th of June, 1881, &c., did feloniously, unlawfully, wilfully and maliciously incite, move, procure, did counsel, hire, and command the said Church the said felony and murder in manner and form aforesaid to do and commit, contrary, &c.

It was shown in evidence that Church, prior to this trial, had been taken from the jail by parties and executed.

The state introduced James Thompson (father of deceased) as a witness, who testified, that when he returned from his work about sunset on the 10th of June, 1881, he found the dead body of his daughter lying in the yard, very bloody, and her head crushed in several places, apparently cut in by an axe, and the axe was lying by her; that a chest in his house was broken open, and his money to the amount of six hundred dollars gone—$400 of which being in gold and silver coin, the residue in " greenbacks." Some of the silver taken was very old and of rare kind, such as is not now in circulation. One piece exhibited to him, (which, another witness testified, had been passed to him by Church after the murder) he said he believed was among his silver, for he had never seen another piece like it. The silver had been on hand a long time, and had become dark. Thomas

Adams had paid him one hundred dollars in silver, some time before, all of which was dated prior to the late war, and the most of it was in eagle-half-dollars. Some of the money which had been recovered from Harrison Dockery, (a confessed accomplice with Church in the robbery of the house) was exhibited to the witness, and it was eagle-half-dollars, dated before the war, and dark; and he said he believed it was his money. About two weeks before the homicide, he found a haversack near his fence with biscuits in it.

Thomas Adams was then put upon the stand by the state and testified that he was the brother-in-law of Miss Thompson, the deceased; that Church, when he was being carried to the penitentiary, stayed all night at his house, and the deceased was there; lives three miles from James Thompson's; had paid him one hundred dollars about four years before, in silver money, dated before the war, and eighty dollars of the amount were half-dollar pieces. The witness also testified that Church had made his escape from the penitentiary, or from the guard who had him and other convicts in charge, and was at large at the time of the homicide.

Harrison Dockery was then examined as a witness for the state, and that portion of his testimony material to the questions raised by the prisoner's exceptions, is as follows: The first time he ever heard anything said about the robbery of James Thompson was about one week before the robbery and murder, when he and the prisoner (Davis) and Elijah Church were together, and after they had talked about some meanness, the prisoner said to Church, "when will you be ready to take that trip?" Church replied, "most anytime." Prisoner said his leg was sore, he could not go, but would give the witness fifty dollars to go in his place and watch the house, and he the witness should not be hurt. The agreement was made between them; and they agreed it should be done by the 10th of June, 1881; and on Thurs-

day the 9th of June, 1881, the witness and Church started from his house in the county of Wilkes, and went to George Thornburg's, but Church did not go up to the house.

Witness got some rations, and after dark he and Church went to Thornburg's spring-house and took a crock of milk and drank it, and then went on towards Thompson's, arriving there about day-break. After day, Church went to watch Thompson, returned between twelve and one o'clock, and said Thompson had got his horse and gone to ploughing, and now was the time. They went up to the house, witness stopping at the fence about ten feet off; Church asked the deceased for her father's money; she told him he had no business with his money; Church said, damned if he wouldn't have it; he came for it; she let him go into the house. Witness heard her ask him his name, and he said, " my name is Lige Church," and she then said, "you are the man that stayed at Tom Adams' when they carried you to the penitentiary." Church came out of the house with a large roll of " greenback " money, and a satchel of silver money.

They started off, and after going about twenty five yards Church said, " it will not do to leave the thing undone, I told her my name," and after handing witness the things and telling him to go on, he went back to the house. In the meantime the witness went back to the fence, and Church had then knocked the deceased down and was hitting her on the head with an axe. As they went off, Church took out a twenty dollar gold piece, and said, " it is the prettiest I ever saw." They travelled mostly in the woods until they come to the "graded road " on which, about a mile distant, lived John Adams, the way to whose house they inquired of parties they had met. They reach Adams' late at night, and after Adams came out, Church said, " by God I raised him," and Adams replied, " that's a fine thing."

Witness understood John Adams to ask Church what had

become of the woman, and said to him, "you may be caught," and Church replied " the woman will never bother any one." Adams gave them some meat, and they went into the road, laid down their sacks of money and built up a fire, and Adams picked up one of the sacks and left. Witness never saw Adams before, but took a good look at him while he and Church were talking, and knew him the next time they met. He had a peculiar voice which the witness recognized. After leaving Adams', they reached their old neighborhood about noon on the next day (June 11th) and hid their clothes in the woods, and of the fifty-five dollars of the money which the witness got, he hid nine dollars in half dollar pieces in a hole under the root of a tree.

On the following Friday (June 17th) they passed over the Brushy Mountain and went to rob an old man by the name of Erastus Redman. In the fork of a white oak near Redman's fence, they hid a satchel, cup and large needle. They robbed his house and got one hundred and sixty-eight dollars. When they went off, the witness forgot the cup and needle, and left them. On the Sunday after this robbery, witness and Church went to Virginia, and on their way they called at a Mr. Smith's store, near Ore Knob, and bought a pair of pants, traded a pair of boots they had for a pair of shoes, and Church bought a coat and a pistol with a white handle, and some other goods. They also went to the store of one Weaver and bought goods, Church buying a brace and bit. The articles were paid for mostly in silver money, and Church paid Weaver the old coin (which had been shown to the witness, James Thompson,) asking him if he ever saw anything like it.

On their return from Virginia, witness started for Watauga county, and met the prisoner, Davis, at the store of one White, and the prisoner asked the witness "if he had got his pay all right," he replied that he had, and then asked

a similar question of the prisoner, to which an affirmative answer was also given.

This witness testified to many other matters, and said when in jail he made a free confession of all the statements given in his testimony, and gave information where his and Church's clothes were hid, and where his money was concealed—under the root of the tree.

All of the above testimony was given in without objection.

The witness was then asked by the state solicitor, if before the murder of the deceased he heard Church say anything about his and the prisoner's (Davis) going to James Thompson's. The prisoner's counsel objected to evidence of any statement of Church or of anything Davis did, on the ground of the want of proof of a common design.

The judge held there was "proof of a common design to commit the robbery, and any statement in furtherance of the common design was evidence against the prisoner, and overruled the objection.

And the witness then testified that when Church and he were on their way to Thompson's, Church said that he and Davis had been there about two weeks before, " and got all the ropes about it." Prisoner excepted. He further stated that Church told him that when he went there on the last mentioned occasion he lost his satchel with some bread in it.

There was much evidence offered by the state to corroborate this last witness (Dockery, the accomplice,) and among the witnesses introduced for that purpose was Erastus Redman, who testified as to the kind of money taken from his house on the said 17th of June. During his examination he was asked, if in consequence of what Dockery said about the cup and needle, he made any search for them, and he stated that he went to the white oak and found the cup and needle where Dockery said, in his confession in jail, he had left them. Prisoner objected to the question, and upon its being overruled, excepted.

This witness also testified that the old and rare piece of coin which Thompson said he believed to be his, was not like any money that was taken from his house, and that he had never seen a piece like it.

Julius Smith and W. C. Weaver were introduced by the state and testified that the witness, Dockery, and a man, who said his name was Elijah Church, came to their respective stores in Alleghany county, about the 20th of June, 1881, and bought the articles mentioned in Dockery's testimony, and that they seemed to have plenty of money.

While the witness, Weaver, was under examination, and naming the articles which Church bought of him, the prisoner's counsel objected to his stating that Church bought a brace and bit; objection overruled, and he was allowed to state the articles bought by Church, and the quantity and kind of money he paid witness for them. Prisoner excepted. He also testified that Church passed to him the old rare piece of coin, dated in 1793, which Thompson said he believed to be his.

The prisoner among other witnesses introduced John Adams, who testified that Dockery and Church did not go to his house on the night of the day when the deceased was murdered, nor did he receive any silver money from Church on that night, as testified to by Dockery.

On the cross-examination of this witness, he was asked by the state where he got certain old Spanish and Mexican silver dollars, which he had passed to certain persons since the murder of the deceased, and he replied that he had some of this money before the war. The state then, for the purpose of affecting his credit, handed him the memorandum of his taxable property for the years 1880–'81, which purported to be signed by him, and asked him if he signed it and if he listed for taxation any money for those years. The witness answered that he did not sign it, he could not write, and did not know that he authorized any one to sign

for him ; and the state asked permission of the court to call one J. M. Mitchell to prove that the witness had authorized his name to be signed to the memorandum ; prisoner objected, but the court allowed Mitchell to be examined ; and he stated that he signed Adams' name to it at his request and in his presence, and that it was read over to him at the time. Prisoner excepted.

The prisoner's counsel prayed the following instructions :

That if prisoner procured Dockery to go and assist in the robbery of James Thompson, and after they had completed the work for which he had been hired, and had left and gone some distance away, and then Church returned and murdered the deceased contrary to the wishes of Dockery, the jury cannot convict the prisoner, Davis, under this bill of indictment.

The judge charged the jury that he would give this instruction, provided they found from the evidence that the prisoner procured Dockery to go and assist in the robbery, but did not procure Church ; that the jury must be satisfied that the prisoner procured Church. That the state contended there was a combination and agreement between Church and the prisoner, and that the hiring of Dockery by the prisoner to go with Church, was one of the means of procuring Church to commit the robbery, and then to commit the murder to conceal the robbery ; it was incumbent on the state to satisfy them upon the evidence that such was the case. That if Church after the robbery left the house twenty five steps and then returned and murdered the deceased through his own malice and not to conceal the robbery, the prisoner, though the jury should believe he procured Church to commit the robbery, would not be guilty as accessory to the murder ; but if they should believe that the prisoner procured Church to commit the robbery, and that Church murdered the deceased to conceal

the robbery, then the jury should find the prisoner guilty as accessory to the murder. Prisoner excepted.

Verdict of guilty, judgment, appeal by prisoner.

*Attorney General,* for the State.
*Messrs. D. M. Furches* and *M. L. McCorkle,* for the prisoner.

ASHE, J. The first exception taken by the prisoner on the trial was to the ruling of the court in permitting the question to be put to the witness, Dockery, "whether before the murder of the deceased, Church said anything about his and the prisoner's going to James Thomspon's."

In this there was no error, for the witness had testified that in a conversation between him and Church and the prisoner, the latter had procured him to go with Church to commit the robbery, and the agreement was then made between them that it should be done by the 10th of June. This was some proof of a common design, and any statement after that, that might be made by Church in furtherance of the common design, is evidence against the prisoner. 3 Russell on Crimes, 280.

The second exception was to the admission of the testimony of Redman in regard to his finding the "cup and needle" of Dockery at the place where the latter had said he left them. We can see no objection to this evidence. The witness Dockery had been permitted to testify without objection in regard to the stealing of the witness Redman's money in a few days after the murder, and in giving an account of the transaction he had stated that he left his cup and needle at the white oak where he and Church had stayed the night before the larceny. The testimony was immaterial, except so far as it served to corroborate the testimony of Dockery, in which respect it is not inadmissible.

The third exception was to the ruling of the court in allowing the witness, Weaver, to testify about the pistol and

other articles bought of him by Church on the 20th of June. The objection was properly overruled. If there was anything in it, it came too late, for the witness had stated before the objection was raised, that Church had bought the articles, as testified to by Dockery, in the enumeration of which by him, the " brace and bit" was mentioned. But aside from that, the testimony of Weaver was very pertinent and important; for he testified to the passing to him by Church in payment for the articles purchased, the old rare piece of money of the coinage of 1793, which was identified by Thompson as of the money stolen from him on the day of the murder. Whatever was said or done by Church at the time of passing the coin, made a part of the *res gestæ* and was admissible. The purchase of the brace and bit, and the payment for it and the other articles, was a continuous and contemporaneous transaction, and that constitutes the *res gestæ*.    Taylor on Ev., § 538.

The fourth exception was to His Honor's ruling in permitting the state solicitor to prove by Mitchell that John Adams, a witness for the defence, had authorized his name to be signed to the memorandum of his taxable property for the years 1880 and 1881. The witness, Adams, was introduced by the prisoner for the purpose of contradicting the statement by Dockery of the fact of the reception, by Adams from Church, on the night after the murder, of a part of the stolen money. The witness denied that he had received any silver money from Church on that night, as testified to by Dockery. And on the cross-examination he was asked by the solicitor, where he got certain old Spanish and Mexican silver dollars he had passed to certain persons since the murder of the deceased. The witness answered he had some of this silver money before the war. The solicitor then exhibited to him his lists of taxables for the said years, and asked him if he signed them. He answered that he did not

and did not know that he had authorized any one to sign them.

It was important for the state to contradict the witness (Adams); for Dockery, the state's witness, had been corroborated in every material particular of his testimony, and if Adams' testimony had been permitted to pass uncontradicted, it would have left Dockery obnoxious to the charge of "*falsum in uno, falsum in omnibus.*"

But it is insisted by the prisoner's counsel, that the question propounded to Adams in regard to his having old Spanish and Mexican dollars in his possession, since the murder of the deceased, was as to an irrelevant or collateral matter, and the state concluded by the answer of the witness, and should not have been allowed to go into evidence *aliunde* in order to contradict the witness. As a general rule this is true. But there is an exception, where the question put to the witness on cross-examination tends to elicit testimony which directly connects the prisoner *with the cause or the parties. State* v. *Patterson,* 2 Ired., 346; Taylor on Ev., § 1298. Another exception is, where the cross-examination is as to matters, which although collateral tend to show the motive, temper, disposition, conduct or interest of the witness towards the cause or parties. *Ib.* And we cannot conceive of a stronger motive to swear falsely than that which operated upon the mind of the witness, Adams, for if Dockery was to be believed, he was not only guilty of receiving stolen goods knowing them to be stolen, but was an accessory after the fact to the murder of the deceased.

The next exception was to the refusal of His Honor to give the special instructions asked by the prisoner's counsel —" That if the prisoner procured Dockery to go and assist in robbing James Thompson, and after they had completed the work for which he had been hired, and had left and gone some distance away, and then Church returned and murdered

the deceased contrary to the wishes of Dockery, the jury cannot convict the prisoner."

His Honor committed no error in declining to give the instruction, or in the charge which he gave the jury. He instructed them that if they believed Church after the robbery left the house twenty or twenty five yards, and returned and murdered the deceased through his own malice and not to conceal the robbery, the prisoner, though they should believe he procured Church to commit the robbery, would not be guilty as accessory to the murder. But if they believed that the prisoner procured Church to commit the robbery, and that Church murdered the deceased to conceal the robbery, then the jury should find the prisoner guilty as accessory to the murder.

The charge is fully sustained by the authorities. In Foster's Crown Law, 370, the principle is laid down, "that if A adviseth B to rob C, and he doth rob him; and in so doing, either upon resistance made, or to conceal the fact, or upon any other motive operating at the time of the robbery, he killeth him, A is accessory to the murder." See also Roscoe's Crim. Ev., pp. 170, 171.

After the return of the verdict, the prisoner's counsel moved to arrest the judgment, on an alleged defect in the bill of indictment. The counsel contended, or rather *suggested*, that the bill was defective because the prisoner, indicted as accessory for a substantive felony, ought not to be joined in the bill with the principal. But the bill is in the usual form of an indictment for a substantive felony. In such indictments, it is essential to aver the guilt of the principal, and that was all that was intended to be done in this bill.

There is no error. Let this be certified, &c.

No error.                                        Affirmed.