The prisoner was indicted for the killing of one Henry Ponton by shooting him with a pistol on the fifth day of November, 1883. *Page 583 
Exception 1, 2, 3, 4. The facts relating to exceptions to jurors are stated in the opinion.
Sam Jarrett, a witness for the state, testified that he knew the prisoner, and knew when deceased was shot, and that he saw the prisoner get off the 4 o'clock train at Halifax the evening of the day the homicide was committed.
G.H. McDaniel testified for the state that he knew the prisoner and the deceased; that prisoner had pawned his pistol to the witness for whiskey and came into his shop about dark on the evening of the homicide and asked witness for the pistol and whether it was loaded. Witness replied that it was just as he had left it. He seemed excited and took a drink and witness gave him the pistol. Witness kept a bar about 400 yards from Bob Daniel's store, and about 700 yards from Parker's gin-house.
Henry Purnell testified that he was in the town of Halifax in the evening before deceased was shot at night; that he saw the prisoner, his son John Henry Mills and Columbus Cook talking near Bob Daniel's store; that John Henry Mills was prisoner's son; that he saw prisoner laying off his hands and heard prisoner say, "we'll get him;" that one of the others replied, but witness did not hear what he said; that prisoner said Henry had done something, but witness did not understand what; it was then about sun down, and witness stopped when he heard prisoner mention Henry (witness' name being Henry), and then the prisoner and the other two began to whisper.
Witness further testified that after he went into Daniel's store, Henry Ponton, (the deceased) came in and handed Mr. Grizzard some money to change, and that prisoner came in soon after Ponton, and threw his arms around him and asked Ponton where he had been all day; that he had been looking for him all day. Ponton said, "what do you want?" Prisoner said, "I want to get 1/2 pint of whiskey and I want you to drink it all. I want you and me to have a damned *Page 584 
big time." Prisoner then went back into the bar-room, the back room of the store. Ponton stopped to talk with witness and prisoner came back and said, "come on and let us take a drink, don't take up time to talk with Jesus Christ, when I am talking to you." Witness further testified that he remained in the front room of the store a half hour later, and in coming up street, heard some one calling Henry Ponton in front of Eliza Price's restaurant about 15 steps from Daniel's store; saw it was Eaton Mills. Witness heard Eliza Price say: "some one is calling you." Witness then saw prisoner and deceased go arm in arm towards Daniel's store, but could not see whether they went in or passed on. It was then "good dark," but witness recognized both. Henry Ponton is now dead.
Tom Ousby testified that he kept a bar-room in the back of Daniel's store in the same building. Ponton passed through a middle door from Daniel's store to the bar kept by witness. Prisoner came in about 3 o'clock in the afternoon that deceased was shot, and paid an account due to witness, and went out. Prisoner and deceased came in about dark or a little before. Prisoner bought a half pint of whiskey and filled two glasses. Ponton drank one, but prisoner did not touch the other. Prisoner made witness fill Ponton's glass again and Ponton drank it. Prisoner told Ponton to go and drink and not to wait for him. The prisoner then insisted that Ponton should drink the glass poured out for him (prisoner). Ponton said: "No, I don't want any more, I have enough. Give it to Mr. Manney." Prisoner said, "No, drink it yourself, I don't want to treat any body but yourself." J. E. Manney was present, sitting in the bar-room; Columbus Cook was standing with one arm on the bar; John Henry Mills was sitting behind the middle door in the bar-room, and near a stove.
After deceased and prisoner got through, they walked arm and arm by the store and sat on some empty beer crates. *Page 585 
Prisoner said: "We are the best friends in the world, ain't we?" Witness was called by a Mr. Lancaster, who said that Daniels had gone home. Henry Ponton then got up and walked out. Witness went out to see Mr. Daniels, and saw Mr. Daniels and deceased talking near the front door, and after he spoke to Mr. Daniels he met the prisoner about half way in Daniels' store going towards the front door; he also met John Henry Mills coming through the middle door, and as witness passed into the bar-room, Columbus Cook went towards the front door across the store. About five minutes later witness opened a side door and saw two persons going towards Parker's gin, and took them for Columbus Cook and John Henry Mills. Witness then went in and shut the door. In about 5 or 10 minutes after he shut the door, he heard a pistol fire twice. In a second a man ran by the door and said: "Some one is shot down there." The shots were fired in the direction of Parker's gin. Witness opened the back door again and saw some one coming from the direction of Parker's gin saying, "Oh! Oh!" He went to meet him, J. M. Grizzard, Jr., following witness. He was running fast when witness first saw him. He was on his knees when witness got to him, and was in 25 steps of the store. Witness said: "Is that you, Henry?" Deceased said: "Yes, sir. I am dying, I am dying. I have been shot three times. I am bound to die. The shot is inside of me, and I am bound to die." Witness was looking at the wound on the head, and when deceased first said, "I am dying," witness said, "I reckon not." Deceased then said: "I am bound to die. The shot is inside of me." Deceased then said: "Please do something for me, I am shot all to pieces." Witness afterwards saw three holes, one in his temple, another in his side and a third in his back. Witness went for a doctor; saw the wounds after the doctor had examined him. After he returned with the doctor, he heard deceased say *Page 586 
again and again, "I am bound to die. I am shot three times. I am dying."
5th exception. The solicitor offered to show the declarations of the deceased, made after the witness returned with the doctor and after deceased said repeatedly, "I am dying," "I am shot three times." Prisoner objected. The objection was overruled, and prisoner excepted.
The witness then testified as follows:
After the deceased said "I am dying," he said "Eaton Mills asked me to go to Bob Daniels to get supper with him. We were going on together arm in arm, and Eaton took his pistol and put it right to my face and shot me for nothing."
Witness asked deceased where it occurred? Deceased said: "Right down there at Mr. Parker's gin." Deceased said also, "that just as he got down there he saw two other men in front of Parker's gin." Deceased was coming from the direction of Parker's gin when witness saw him.
Daniel's store is about 200 yards from Parker's gin. Daniel's dwelling is about 300 yards beyond Parker's gin and 500 yards from the store. The gin is on the path leading from his store to his dwelling house. Persons usually travel that path instead of the road in going from his store to his house.
There is an old railroad track just in front of Parker's gin and within 75 yards of Parker's gin.
6th exception. On cross-examination prisoner proposed to show by the witness, that the person that ran by and said: "Somebody has shot somebody" was Washington Johnson and that Washington Johnson said also that the shooting occurred near Parker's gin. The reason given for offering the testimony was, that Washington Johnson was summoned for the state, and would probably be introduced as a witness (though he had not then been introduced) and the testimony was offered to contradict him. Objection for the state was sustained, and prisoner excepted. *Page 587 
7th exception. W. T. Parker testified for the state that as he was coming back from supper on the night referred to by other witnesses, and heard a noise in Eliza Price's shop; he went in and found Henry Ponton there. Deceased said that he was shot in the side and back, and was going to die; that the shot in the back was hurting worst; and he was bleeding internally from that, and was bound to die. He did not say anything further that witness recollects. The prisoner objected to proof of declarations then made by deceased. The objection was overruled, and prisoner excepted.
The witness further testified as follows: "Just after deceased said that he was bound to die, witness asked him who shot him. He replied that Eaton Mills shot him; witness said, "what for?" Deceased said, "nothing."
Eaton Mills was not arrested till some time after that. A reward was offered for him by the governor before he was arrested. Parker's gin was in about 100 yards of the track now used by the Wilmington and Weldon railroad company.
8th exception. The solicitor proposed to show by the witness that the "fast train" on said railroad passed soon after the shooting. The testimony was offered to be considered in connection with the other evidence, that prisoner, his son and Cook, were seen talking together and what was said; that prisoner afterwards tried to make deceased drink three glasses of liquor; that Cook and John Henry went up the path after dark, and prisoner followed arm in arm with deceased, and that pistols were fired about Parker's gin, as tending to show a purpose on the part of the prisoner to kill deceased and place him on the railroad track before the train should pass. Objection was overruled and prisoner excepted.
Witness further testified that the "fast train" arrived at that time about one-half or three-fourths of an hour after *Page 588 
dark, but had not yet passed, when witness came back from supper and saw deceased at Price's shop. It was then about time for the train to pass.
R.H. Daniel testified that he went home from the store on the night when deceased was shot, saw prisoner and deceased at his store just before leaving for his dwelling; that he had just reached his front gate, when he heard two or three pistol shots. After the witness reached home, he heard a noise in the back yard, went out and saw Eaton Mills with a pistol in his hands, and ordered him to leave. This occurred about 15 minutes after witness reached home. It was just before the time for the fast train to pass.
9th Exception. Washington Johnson testified, that he met prisoner and deceased on the path leading from Daniel's store to his house on the night when the shooting occurred. They were going arm in arm towards Daniel's. Witness heard pistol shot some minutes after he passed them, and after the second shot the witness heard deceased cry out "Oh! Lord, you have killed me, don't let that man shoot me any more."
10th Exception. John H. Ponton testified for the state that he saw Eaton Mills the day previous to the killing, in Weldon. The solicitor was allowed to prove by this witness, that he saw Eaton Mills, Columbus Cook and John Henry Mills together in Weldon in the afternoon before deceased was shot; that he heard Eaton Mills say to Columbus Cook, that he had money enough to pay him out of all his difficulties, and he intended to have satisfaction before he slept that night, and that witness saw all three of them get on the train going towards Halifax from Weldon soon after he heard that. The prisoner objected to the competency of the testimony, but the objection was overruled, and prisoner excepted.
11th Exception. Dr. Ferguson testified for the state, that he had been a practising [practicing] physician for over two years, and *Page 589 
went to see deceased after supper, and first heard deceased say he was dying, that he was shot all to pieces, that he had been shot three times and the wound was bleeding internally. He said to witness that he could not live. Witness does not recollect if he asked witness if he could do anything for him. He did not ask witness if he was then dying. Witness tried to encourage him, when deceased said to witness that he was bleeding internally and could not live. Just after that he made a statement about the shooting.
Prisoner's counsel objected to proving the statement as a dying declaration, and the objection was overruled. Prisoner excepted.
Deceased said to witness that Eaton Mills took him off from the store in a very friendly manner walking arm in arm, and when they got to the old railroad track near Parker's gin, prisoner stopped, and the first thing he (deceased) knew, Eaton Mills had a pistol pointed at his eyes, and fired before he could get away, and shot him three times; that he fired twice before he (deceased) got loose and ran, and that he fired the fatal shot as he (deceased) was running.
Witness further testified that deceased died from secondary hemorrhage caused by the wound in the back.
On cross-examination, the witness testified that on Friday, two days after deceased had been wounded, he encouraged deceased and told him he thought he might get well, and deceased seemed more cheerful, and said he was better; that witness had not then examined the wound in the back. Prisoner's counsel then moved the court to rule out all proof of dying declarations shown by the witness to have been made on the night he was wounded. The deceased died on the Friday following. The motion was refused, and prisoner excepted.
12th Exception. John Henry Mills was introduced for the prisoner, and testified as follows: Witness and Columbus Cook were tried for killing deceased, and were acquitted. *Page 590 
On Wednesday he went to Weldon to get some money from his father (the prisoner) and then he and Columbus Cook went with the prisoner to Halifax before sunset. He was in Bob Daniel's store, and was also in Ousby's bar-room; started with Columbus Cook to Mr. Daniel's house and on the way passed Parker's gin. They stopped at Parker's gin and while they were at the gin the prisoner passed along the path alone. He passed very near to them but did not appear to see them.
There was fire in the engine and witness lighted a cigar after prisoner passed. Prisoner was walking very fast towards Bob Daniel's, and had gotten about fifty yards from witness on the path when witness heard something like a rock thrown against a tree. He then heard something like a scuffle and he and Cook started towards where they heard the noise. He met some one before he got to prisoner, does not know who it was, but heard him say, "Oh! you've shot me." He was coming towards the town. Witness was in about two yards of the railroad track, when the man passed.
After that, witness and Cook went on and found prisoner just on the other side of the old railroad in the path going to Mr. Daniel's. Witness had heard the report of three pistol shots before he reach his father.
The prisoner proposed to show by the witness, what prisoner said about the shooting and how prisoner said it occurred, as a part of the resgestae. Objection by the state was sustained, and prisoner excepted.
The witness further testified that prisoner had a scar on his forehead, and that he felt something like blood on his forehead.
The prisoner testified (among other things not material), that as he was going along the path, he was suddenly assailed by deceased with a deadly weapon and knocked down, and that he shot deceased while lying on his back. *Page 591 
13th Exception. Garland White testified for the prisoner, that he is a minister of the gospel and has been for thirty years. Counsel for the prisoner proposed to ask this witness the following question: "During the last thirty years have you, as a minister, been often at the death-bed of people of your race (colored) and heard their dying declarations?" "If so, do you think from your observation and experience that you can estimate the weight that should be given to such declarations of colored people inextremis?" The solicitor objected. Objection sustained. Exception.
14th Exception. J.H. House was introduced as a witness for the state in reply, and testified that while acting as deputy sheriff, he arrested John Henry Mills (who was examined as a witness for prisoner). He was arrested on the charge of the killing of Henry Ponton. He arrested him near Littleton; several men were along but there was no violence, and no display of arms, and that no threats were at any time made against him, nor were any inducements offered to him to make a statement. John Henry Mills has since been tried and acquitted of the charge. After witness arrested him, he was riding behind witness on his horse, and some other persons were along, when John Henry Mills said to witness, "I want to speak to you, pull your horse back." He said, "Mr. House, is a man responsible for what another man does?" He said he wanted to tell witness something, and hesitated. Witness said to him, "I reckon it would be the best for you to make a clean breast of it." The solicitor proposed to offer the declarations of John Henry Mills then and there made, not as substantive testimony against the prisoner, but to contradict the testimony of said John Henry on behalf of the prisoner. The court admitted the testimony, after objection by the prisoner, for the purpose only of contradiction, and instructed the jury, that it was to be considered only as tending to show the circumstances under which deceased was wounded. *Page 592 
Witness then testified, that the witness John Henry Mills told him, that Cook came for his father, and his father went to Littleton for him (John Henry) and his mother objected to his going; that he and the prisoner and Cook went to Weldon, thence to Halifax, and found Ponton and went around drinking with him, and that he and Cook left them in a bar-room and went on to an engine; that in a few moments deceased and prisoner came along, walking arm in arm, and passed near him and Cook; that they had gone but a short distance, when prisoner shot Ponton, and Ponton said: "Oh! Eaton, you've killed me! What did you shoot me for?" The deceased got up and ran, and Eaton shot him the third time; at that time prisoner came to them and said: "I have killed the d___d scoundrel, and now I want to kill Olive Perkins;" that prisoner proposed they should go with him; that they ran off to the railroad and hid in the bushes and took the train for Weldon soon after; that he did not see prisoner for several days, and prisoner sent for him and his mother and said, that either he (the prisoner) or John Henry must leave the country; that he wanted him (John Henry) to leave, but his mother objected and told prisoner he must leave.
It was admitted by the solicitor that if Hulda Williams was present, she would testify in behalf of the prisoner, "that the prisoner was at her house about seven miles from Halifax, on Friday morning after deceased was mortally wounded, and that the prisoner was then severely wounded on the forehead.
The jury found the prisoner guilty and from the judgment pronounced, the prisoner appealed.
We have examined the record in this case with *Page 593 
that care which is due to the consideration of the serious crime with which the prisoner is charged. He has filed a great many exceptions, some of which are perfectly frivolous, but to such as are worthy of consideration we proceed to give the conclusions to which we have been led.
1. The exception to the ruling of the court, that the juror was a free-holder, who had married a woman seized of land, and had children by her born alive, cannot be sustained. The record does not show when the marriage took place, nor does it show whether the juror was summoned on the original panel or on the special venire. If on the original panel, he was not required to be a free-holder, (THE CODE, § 1722), and in that case, though there might have been error in the ruling, it could not have prejudiced the prisoner.
If he was married and the land acquired by his wife before the adoption of the constitution of 1868, called the "marriage act," he was a tenant by the courtesy initiate notwithstanding the act of 1848. Houston v. Brown, 7 Jones, 161. And if he was tenant by the courtesy initiate, he was necessarily entitled to the possession. Wilson v. Arentz, 70 N.C. 670. And if entitled to the possession, he had a right to the pernancy of the rents and profits, and that in contemplation of law made him a free-holder, in the sense of that term as applicable to the qualification of jurors, although he might not be seized of the legal estate. State v. Ragland,75 N.C. 12.
The court held the juror was a free-holder and we must presume he was either a juror on the original panel or a tenant by the courtesy initiate; for unless the appellant distinctly points out the error sought to be reviewed, this court will presume the ruling of the court below to have been right. Wall v. Hinson, 1 Ired., 276; Flanniken v. Lee, Ib., 293.
2. There is no force in the objection that the name of J.L. Butt, summoned by the sheriff as a juror, was entered on a scroll as "J. S. Butt." "J." was the initial of the *Page 594 
first christian name in both, and the initial of the second christian name is unimportant. It is held that the use of a middle letter forms no part of the name. Roscoe's Crim. Evi., 81, note 1, and McKoy v. Speck, 8 Tex. 376
[8 Tex. 376]; King v. Hutchins, 8 Foster, 561; Oskin v. Davis, — Ill., 257; 14 Barb., 259. The objection came too late. It should have been taken before the name of the juror, who seems to have been summoned on the special venire, was put in the box, Statev. Simmons, 6 Jones, 309, and in no way could the prisoner have been prejudiced, for there was no such man in the county as "J. S. Butt."
3 and 4. When a juror examined on his voire dire replied to a question asked him, "that he had said it would ruin or injure any lawyer politically with certain persons in the county to appear for the prisoner," and the juror was asked by prisoner's counsel to name them, the court very properly held that it was not material upon the question of fairness of the juror to know these names. It seems to have been the object of the prisoner to introduce politics into the jury box, and it was clearly the duty of the court to exclude any such influences from the jury.
5, 7, 9 and 11. There is no merit in the exception to the ruling of the court in receiving the dying declarations of the deceased.
The rule for the admission of such testimony is thus laid down in Taylor on Evidence, § 648:
1. "At the time they were made, the declarant should have been in actualdanger of death. 2. That he should have a full apprehension of his danger; and 3. That death should have ensued."
From the time the deceased was shot, up to the time he made the declaration as testified to by the witness Ousby, he was heard repeatedly to say, "I am bound to die." He told the witness Parker that he was shot in the side and back, and was bleeding internally, and "was bound to die." *Page 595 
Before the declarations of deceased as testified to by Dr. Ferguson, on the night of the shooting, deceased said to witness that he "was dying;" that "he was shot all to pieces; that he had been shot three times and the wound was bleeding internally, and he could not live." This witness, on cross-examination, stated that on Friday, two days after the shooting, he told the deceased "that he thought he might get well, and deceased seemed more cheerful and said he `was better,'" that the witness had not then examined the wound in the back; that the deceased died, from secondary hemorrhage caused by the wounds, on the Sunday following.
The prisoner's objection to the admission of the declarations seemed to have been founded upon the fact that the physician, two days after, gave hopes of recovery to the deceased by telling him he thought he might get well. However that might have been, it did not affect the admissibility of the testimony. The deceased was manifestly in the apprehension of impending
death when he made both the declarations. He was in the actual danger of death and did die from the effects of the wounds.
This sufficed to make the declarations admissible, and no hope of recovery subsequently inspired could render them incompetent. State v.Tilghman, 11 Ired., 5513.
6. The objection to the rejection of testimony to contradict the witness, Washington Johnson, before he was examined, is too frivolous.
8. There is nothing in the exception to the admission of evidence that the "fast train" on the railroad passed soon after the shooting and the track was near the gin-house when the shooting was done. It was offered in support of the theory entertained by the solicitor that the prisoner, assisted by his son and Cook, proposed to kill the deceased, and place his body on the track. Whatever may have been the motive of the prisoner in conducting the deceased, after plying him with whiskey, to the gin-house, which stood not *Page 596 
far from the railroad track, and then shooting him in the presence of his son and Cook just before the train was to pass, the theory is not without probability, and there was no error in receiving the evidence.
10. The state was allowed to prove that prisoner and John Henry Mills and Columbus Cook were seen together in Weldon in the afternoon of the day the deceased was shot, and the prisoner was heard to say to Columbus Cook, "that he had money enough to pay him out of all his difficulties, and he intended to have satisfaction before he slept that night," and afterwards all three of them got on the train going from Weldon to Halifax. The declarations of a prisoner are always evidence against him when pertinent to the issue. State v. Bryson, 2 Winst., 86. Here was a declaration involving a threat, and in a few hours the deceased was shot by the prisoner. The most reasonable inference is, that the threat was made against the deceased. The evidence was clearly pertinent and admissible.
12. The prisoner, in defence, offered to prove a statement made by him soon after the shooting as to how it occurred, but it was properly ruled out by the court. No declarations of a prisoner made after the commission of a homicide, as to the manner of the transaction, that are not of the resgestae, are admissible. State v. Brandon, 8 Jones, 463; State v. Tilly, 3 Ired., 424; State v. Scott, 1 Hawks, 24. The statement of the case excludes the idea that they were of this nature. The declarations proposed to be proved were after the act was past and done.
13. The prisoner, to impeach the dying declarations of the deceased, proposed to proved by one Garland White, a minister of the Gospel, what weight was to be attached to the dying declarations of colored persons inextremis. The court properly ruled it out. This exception needs no comment. *Page 597 
14. The last exception taken by the prisoner was to the declarations of John Henry Mills when he was arrested by the sheriff under a charge of the state for killing Henry Ponton, the deceased, for he had been tried for that offence and acquitted. This evidence was offered by the state, not as substantive evidence, but for the purpose of contradicting the testimony which John Henry Mills had given in behalf of the prisoner on the trial of this case. The testimony we think was competent for that purpose.
The ground of that objection is not stated, but we presume it was upon the ground the statement made by John Henry Mills to the witness, the deputy sheriff, when he was arrested, was made under the influence of hope excited by the remark of the officer "that he reckoned it would be best for him to make a clear breast of it."
We are not prepared to say but that the declaration made under those circumstances would have been inadmissible as a confession upon the trial of the prisoner for the crime, in reference to which the declaration was made, as tending to implicate himself. But we think there must certainly be a distinction between a declaration offered in evidence as a confession of a crime against a person charged therewith, and the declaration when offered solely for the purpose of contradicting the testimony of the declarant given as a witness on the trial of another.
"A confession is the voluntary declaration by a person who has committed a crime or misdemeanor, to another of the agency or participation of which he had in the same." Bouvier's Law Dictionary.
The confession must be voluntary. It is well settled that if induced by the flattery of hope or the torture of fear," it is inadmissible.
This is a rule adopted by the humanity of the criminal code, in its tenderness for human life, exclusively for the benefit of the accused, upon his trial for the crime confessed, *Page 598 
to guard him against the possibility of the danger of falsely implicating himself from a motive of hope or fear.
But the principle of the rule has no application to the declaration, when offered in evidence to contradict the testimony given by the declarant in his examination as a witness on the criminal trial of another. In that case the credibility of the witness is alone involved, and it is a question for the jury to determine, whether his testimony is affected by the contradictory evidence; and if so, to estimate the extent to which it has been impaired by the contradiction, taking into consideration all the circumstances of the case, the hopes, the fears and all influences that might have been employed, to induce the declaration.
If the fact that the preliminary question was not put to John Henry Mills before the contradictory evidence was offered, was a ground of objection to the evidence, it is not tenable. For the declaration offered in evidence to contradict him was directly and immediately material to the issue, and in such case it was not necessary to ask him the preliminary question to call his attention to the statement offered to contradict. That is only necessary where the testimony of the witness relates to some collateral fact, or some act of his tending to show his bias, partiality or prejudice towards one of the parties to the action. But where the testimony relates directly to the subject of litigation, it may be met by evidence of contradictory statements, previously made, without asking him the preliminary question. State v. McQueen, 1 Jones, 177; Jones v. Jones,80 N.C. 246 State v. Davis, 87 N.C. 514; Radford v. Rice, 2 Dev. 
Bat., 39.
Our conclusion is there is no error. This opinion must be certified to the superior court of Halifax county, that the case may be proceeded with in conformity therewith and the law of the state.
No error. Affirmed. *Page 599