The defendant was indicted for the murder of his wife, Vera Carden, on 4 May, 1934. The jury rendered a verdict of murder in the first degree, and judgment was rendered in the court below of death by electrocution.
The deceased, Vera Carden, died as the result of a pistol shot wound on 7 May, 1934. The evidence shows that she was shot by her husband, the defendant, on 4 May, 1934.
Upon the calling of the above case for trial, the solicitor announced in open court that with his permission Judge Jas. R. Patton, Jr., of Durham, and Major L. P. McLendon, of Greensboro, would assist in the prosecution. Thereupon the defendant, in open court, through counsel, requested the court to require the private prosecution to state in open court by whom they were retained. The motion was denied, and the defendant excepted. The defendant excepted to his Honor's ruling denying the motion to require the attorneys to state by whom they were retained.
The evidence introduced by the State tended to show: That prior to 4:00 o'clock p.m., 4 May, 1934, Vera Carden, wife of defendant James *Page 406 
B. Carden, lived in F. P. Rochelle's house, located on the north side of West Peabody Street, being No. 1024; that a hall ran north and south through the house; that the west side was occupied by F. P. Rochelle, 86 years old, the owner, and his grown son; that the east side was occupied by Vera Carden, deceased, her nine-year-old son, James B. Carden, Jr., and Miss Nina Hunter, who was then living with Mrs. Carden, and had been for two years; that the house was near the middle of the block, and from the rear running north was a frequented path leading to west Main Street; that the deceased worked in the Erwin Cotton Mills, and returned to her home Friday afternoon about four p.m., where she found her husband, James B. Carden, the defendant, and Miss Hunter.
That the defendant James B. Carden had gone to his wife's home by way of the path leading through from Main Street, Friday, 4 May, 1934, a little after twelve o'clock, and asked Miss Hunter if Vera, his wife, had come from her work; was informed that she would not be there until 3:30 p.m.; he then asked where Mr. Rochelle was, whom he was told was on the porch; he said he would go out and talk to him. The defendant ate dinner with Miss Hunter about one p.m., and sent Mr. Rochelle to his sister's home on Gregson Street to get a suit of clothes for him. Mr. Rochelle failing to get the right suit, the defendant went himself and got another suit, changed his clothes, and requested Miss Hunter to press his clothes, which she said she might do. After he changed his clothes, he showed a gun to Miss Hunter, with bullets; took the gun out of his pocket. He said he had the right size of bullets to fit, was going to settle things and was going to fix them and was going to fix them right, so he went out on the porch and sat there until his wife came from work. Was on the porch when his wife returned. She spoke and came into the room where Miss Hunter was. Was followed by the defendant. The defendant, the deceased, and Miss Hunter then sat down in chairs in the room. The deceased then asked Miss Hunter, "Nina, what did you have for dinner?" The deceased said she was hungry and started to tell something. After defendant came in and sat down, in about a minute or two Miss Hunter went out and left the deceased and the defendant alone in the room. In about a minute after Miss Hunter left the room, had gone in the hall, she heard a shot and scream. Then went on the back porch and around the house to Mrs. Cates next door. Saw the defendant go out on the porch, get his hat, and walk straight back through the hall and out the back door and on through the path toward Main Street, the way he always came and went from his sister's home to his wife's. Miss Hunter went in the room, found the deceased lying on her back on the day bed with her head on the pillow. She was bloody and asked for some water. Said she was burning up. Miss Hunter got some water, bathed her face, and *Page 407 
took off her shoes. Found the deceased was shot. One shot was fired, followed by an interval, and then four others in quick succession. Shooting occurred about four o'clock p.m. An ambulance was called and the deceased was taken to the hospital, at which place she died on the following Monday morning, her death being caused by the bullet wounds above described.
That the defendant and his deceased wife had had trouble. That while living with her in Orange County, in 1928, he had been indicted for an assault upon his wife. In December, 1932, he had been indicted for an assault upon his wife, and required to remain separate and apart from her for a year. That he left the city of Durham and went to Richmond, where he remained until March, 1934, when he returned to Durham on account of the death of his father. That he had made threats that he was going to kill his wife. That the deceased had instituted a suit against the defendant for a divorce on 1 May, 1934. Summons was served upon defendant on 2 May, 1934. That the plaintiff had charged him with being an ex-convict and the defendant stated at the time he read about the divorce action in the paper that the reference to his being an ex-convict hurt him; that the shooting occurred on 4 May, 1934; that after the homicide, about 4:00 p.m., 4 May, 1934, the defendant left the home of his wife through the back way and went to his sister's, Mrs. J. F. Williams, where he was living on Gregson Street, about two blocks away. That while there one Thomas Lee Wrenn had called to see him. Found defendant washing blood off his hands and asked him if he had had a fight, and he said yes. He went to the sidewalk to the car, where Wrenn was. Went back into the house, at which time the officers came up and went into the room and found Carden in the kitchen of his sister's home. That he was arrested and searched by the officers. A bottle containing whiskey was found upon him, which the defendant drank while being searched, and asked where the pistol was, defendant said he had thrown it away. The officers found one bullet in the defendant's pocket. On the way to the station Officer Roberts asked the defendant how he came to shoot his wife, and the defendant said, "I do not know how come me to do it"; and when asked how he came to get the blood on his arm, defendant said, "I picked her up and laid her on the bed." The defendant seemed to be right much drunk when he was taken back to jail after talking to Burgess at 7:30 o'clock, though he was arrested at 4:30 o'clock p.m., and was rather nervous, and a heavy odor of whiskey was on his breath.
That the deceased made a declaration to Miss Nina Hunter prior to her death that the defendant had shot her, and told Miss Hunter in the presence of O. B. Wagoner, deceased's brother, that the defendant shot her first through the head and she fell and after she fell he just kept *Page 408 
shooting and shot her four or five times, and also told Dr. W. B. McCutcheon that Buck, her husband, had shot her. The deceased's bedroom was on the east side of the house, facing the north side of Peabody Street; that the door was in the west side of the room leading into the hall; that upon entering the room toward the east from the hall, to the left or to the north behind the door was the day bed, the head of same being against the north wall of the room; that behind the door of the west wall, about three feet from the floor, was a bullet; that in the north wall, about five feet from the floor, were three holes located a little to the right of the day bed; that a discharged ball fell from the day bed to the floor when the officer pulled the cover back on said day bed; that there were no other indications of bullet holes in the room except those mentioned.
That the autopsy showed that the deceased was shot five times; first, below the lobe of the right ear, the bullet lodging beneath the skin on the left cheek; second, the bullet entered the left side of the abdominal wall, ranged downward, penetrated the liver, struck the wall of the stomach, and was recovered in the small intestines; third bullet passed through the right breast 3 1/2 inches of the right nipple and ranged downward; fourth bullet shattered her right thumb, and the fifth bullet entered the back to the left of the spine just under the left shoulder, emerged from the left axilla, it penetrating her lung and causing death.
Mrs. Martha Murphy testified, in part: "Some time about seven or eight months before the homicide, and just before the defendant left Durham to go to Richmond, I heard him make the statement that he was going away, but when he came back he was going to get her (referring to his wife). Said she had made trouble for him and he was going to get her. He said he was going to kill her. He said he was going to kill her and the boy, wasn't no use to leave him here."
The defendant testified as to what took place, as follows: "I remember my wife telling me to go and eat supper with her, and I told her, no, I didn't believe I cared for anything; my wife was then in the bedroom; that was the room I was in. And I told her I was going down to see if I could not collect the money that was taken from me, and I remember her saying — she told me that I was too drunk, and I said, `Well, I am going anyway,' and so I reaches up to get the gun off the chifferobe and when I gets the gun she grabs hold of the gun and in the tussle she gets shot. From there I guess I must have gone to my sister's. I don't remember what happened after the shooting; I guess I must have went to my sister's. I am not sure. I did not have any intention to kill my wife. I did not have any feeling against her. I reached up after the gun and my wife tried to take the gun away from me, and the gun began to fire. I told my wife I was going to take the gun with me. *Page 409 
She told me I was too drunk. I did not know that I had shot my wife or that she was shot, not until she come and sit down in front of me, she comes over and sits down in front of me, when I realized that, I was on my knees in the floor and she comes and sits down in front of me and when she sits down, she lays down on the carpet, she told me, and she says, `I believe I am shot.' After the pistol went off, she come over and sit down in front of me on the floor and I was on my knees at the time. The pistol started to firing and I must have fell about the same time, I guess. From there I was at my sister's house and they brought me down to the police station. After the pistol ceased firing my wife came over and sat down in front of me and said, `I believe I am shot.' I don't remember whether I picked her up and put her on the day bed or not. I did not have any feeling against my wife. I loved her and my boy. I was taken down to the police station and have been in jail since that time."
He testified that he had had trouble with the prosecuting witness, Miss Hunter, and denied that he had made threats against his wife, or assaulted her. Miss Nina Hunter testified: "Buck (defendant) didn't threaten me, he threatened her (his wife). . . . I have never been arrested. . . The trouble in 1932, when he left his wife, was not on account of me. . . . I have never had any trouble with Mr. Carden."
Mrs. J. F. Williams testified: That she is the sister of the defendant. That she was at home on Friday, 4 May, about four o'clock p.m., when defendant came there. He was in a drunken condition and informed her that Vera, his wife, was shot, to go and see her.
Mrs. Christine Gray, daughter of Mrs. J. F. Williams and a niece of the defendant, testified: Defendant came to Mrs. Williams' home between two and three o'clock Friday, 4 May. He was drinking and talked as if he was insane.
Mrs. M. L. Rigsbee, cousin of defendant: Was at Mrs. Williams' ten days before the homicide. Saw defendant and Mrs. Vera Carden, his wife, together. Defendant said, "Here she is, May Lee, isn't she sweet." He kissed her and they all had dinner together. The defendant and deceased were affectionate.
There was other testimony to like effect. There was evidence to the effect that a short time prior to the shooting (some few days) defendant "spent Monday night at my house. He was nervous. He was hitting the side of the house and punching about, almost a wreck. Looked like a maniac. Spent part of Tuesday night at my house. Would get up and down during the night, plundering around, and groaning. Talking about his money being gone. . . . The defendant busted in the back door open, with a knife open in his hand. Defendant in dazed condition. Acted like a crazy man." *Page 410 
The defendant made numerous exceptions and assignments of error, and appealed to the Supreme Court. The material ones and necessary facts will be set forth in the opinion.
The charge of the court below is not in the record, and the presumption of law is that the court below charged the law applicable to the facts.
The first contention of defendant: Did his Honor err in overruling the motion of defendant to require the private prosecutors to state by whom they were retained? We think not.
In S. v. McAfee, 189 N.C. 320 (321), we find: "A solicitor is the most responsible officer of the court, and has been spoken of as `its right arm.' He is a constitutional officer, elected in his district by the qualified voters thereof, and his special duties prescribed by the Constitution, Art. IV, sec. 23 (Judicial Department), `and prosecute on behalf of the State in all criminal actions in the Superior Courts, and advise the officers of justice in his district.' It is said in Lewis v.Comrs., 74 N.C. p. 198: `A solicitor is not a judicial officer.'"
In S. v. Lea, 203 N.C. 13 (26), it is said: "The appearance of counsel for the prosecution, other than the solicitor of the district, was a matter which the trial court necessarily had under its supervision. The solicitor at no time relinquished control of the case, nor does it appear that the assistance of other counsel was not requested or welcomed by him. But without regard to situations, different from the one now in hand, we hold that on the present record, the matter was in the control and sound discretion of the presiding judge."
In 22 R. C. L. (Prosecuting Attorneys), p. 93, it is said: "At common law criminal prosecutions were generally carried on by individuals interested in the punishment of the accused and not by the public. The private prosecutor employed his own counsel, had the indictment found and the case laid before the grand jury, and took charge of the trial before the petit jury. While under the present practice officers are appointed or elected for the express purpose of managing criminal business, the old practice survives in most jurisdictions to the extent that counsel employed by the complaining witness or by other persons desirous of a conviction are permitted to assist the prosecuting attorney in the conduct of the prosecution, and, as a general rule, no valid objection can be raised by the accused to allow the prosecuting attorney to have the assistance of private members of the bar. . . . (p. 94) It is *Page 411 
within the discretion of the trial court to allow special counsel to aid the prosecuting attorney in the prosecution of a case, and such discretion will be interfered with only on a showing of abuse thereof. . . . In all such cases it is within the discretion of the court to appoint competent counsel to assist, or to permit counsel employed by private parties, or even volunteers, to appear for that purpose."
Allowing the solicitor to have private counsel to assist him is largely in the discretion of the trial judge, whose duty it is to prevent injustice and oppression, and only to permit such assistance as fairness and justice may require.
Art. I, sec. 11, of the Constitution of N.C. is as follows: "In all criminal prosecutions every man has the right to be informed of the accusation against him and to confront the accusers and witnesses with other testimony, and to have counsel for his defense, and not be compelled to give evidence against himself, or to pay costs, jail fees, or necessary witness fees of the defense, unless found guilty."
We do not think that the permission by the court of assistant counsel to the solicitor impinges this provision.
In Handley v. State (Ala.), 106 So. 692 (694-5), it is said: "Special counsel may appear in the prosecution as an assistant to the solicitor and with the consent of the court. The management of the case remains with the official representative of the state, in whose name the special counsel appears. The consent of the state is all the authority needed by special counsel; hence, a motion by defendant to require special counsel to show his authority is properly overruled (citing Ala. cases). `In the absence of statute, the state cannot be compelled to disclose the names of private prosecutors or informers, especially where it is not shown that defendant will be prejudiced by the want of such information.' 16 C. J., 801; Statev. Fortin, 106 Me. 382, 76 A. 890, 21 Ann. Cas., 454; Barkman v. State
(Tex.Cr.App.), 52 S.W. 69. The rule is founded upon the public policy that encourages the citizen to give aid in the detection and punishment of crime. . . . The official representative of the state has the first duty to see that no abuses arise, and a failure of duty in this regard will not be presumed unless made to affirmatively appear."
The defendant did not request the court below to find the facts upon which his motion was based, so that this Court could determine if his objection was well founded. The trial court exercised its discretion, and on the facts of this record we see no error.
We think the evidence of Nina Hunter as to the dying declarations of Vera Carden competent. "The court: Said what? Ans.: Said she was not going to live, said she would not even live until they got her to the hospital if they did not get her there pretty quick because she was *Page 412 
bleeding to death. . . . Q. After you got in the room and after she made the statement to you that she did not expect to live? Ans.: What did she say then? Q. Yes, what did she say then with reference to who shot her? Ans.: She told me that Buck had shot her — she called me by my name when I first got there. Q. Said what? Ans.: Said Buck had shot her and had killed her. Q. Did she make any further statement about how the shooting occurred? . . . Ans.: Yes, she said when she got up, she was fixing to leave the room, and when she got up, she went to reach over in the chair behind the door to get her apron to go in the kitchen, she said when she got up was when he shot her the first time. . . . I went to the hospital on Sunday afternoon and was there Sunday night. She said she was going to die Sunday afternoon. On that occasion she said that Buck had shot her and killed her. She called her husband Buck. She called him that all the time. . . . She told us she was going to die and she wanted to see all the folks, Sunday afternoon about five o'clock; well, she said her husband had killed her, she told that over again, said that he had killed her. She told about the same thing she did the first day; she said when she got up out of her chair, he shot and the first shot went through her head and she fell, said when she fell, he just kept shooting and shot her four or five times, she said he shot her five times, which was correct, and kept shooting her, and after shooting her he picked her up and pitched her over there on the day bed."
In S. v. Wallace, 203 N.C. 284 (288), we find: "Dying declarations are an exception to the rule which rejects hearsay evidence, but the conditions under which they are admitted by the courts have often been defined. At the time they are made the declarant must be in actual danger of death and must have full apprehension of his danger; and when the proof is offered death must have ensued. S. v. Mills, 91 N.C. 581. These declarations are received on the general principle that they are made in extremity — `when,' as said by Eyre, C. B., `the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth. A situation so solemn, and so awful, is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice.' Rex v. Woodcock, 168 Eng. Reports, 352." S. v. Layton, 204 N.C. 704; S. v. Ham, 205 N.C. 749; S.v. Dalton, 206 N.C. 507.
The exception and assignment of error "as to the evidence of Mrs. Cates, who testified that Nina Hunter's character was good but upon examination admitted that she had never heard it discussed," cannot be sustained. The witness further testified: "(Question by the court): How long did you live near her, madam; how long have you known her? *Page 413 
Ans.: Been knowing her seven or eight years. Q. What opportunity have you had of knowing her character? Ans.: Well, I have been in her company and been off with her. Q. Off and on over that period of time? Ans.: Yes, sir."S. v. Steen, 185 N.C. 768.
The exception and assignment of error made by defendant as to the exclusion of evidence contradicting Nina Hunter, as to incriminating matters, etc., asked her on cross-examination and denied by her, cannot be sustained.
In S. v. Patterson, 24 N.C. 346 (353), Gaston, J., says: "It is well settled that the credit of a witness may be impeached by proof that he has made representations inconsistent with his present testimony, and whenever these representations respect the subject matter, in regard to which he is examined, it never has been usual with us to inquire of the witness, before offering the disparaging testimony, whether he has or has not made such representations. But with respect to the collateral parts of the witness' evidence, drawn out by cross-examination, the practice has been to regard the answers of the witness as conclusive, and the party so cross-examined shall not be permitted to contradict him. Of late, however, it is understood that this rule does not apply in all its rigor, when the cross-examination is as to matters which, although collateral, tend to show the temper, disposition, or conduct of the witness in relation to the cause or the parties. His answers as to these matters are not to be deemed conclusive, and may be contradicted by the interrogator." S. v. English,201 N.C. 295.
In S. v. Jordan, 207 N.C. 460 (461), is the following: "The general rule is that answers made by a witness to collateral questions on cross-examination are conclusive, and that the party who draws out such answers will not be permitted to contradict them; which rule is subject to two exceptions, first, where the question put to the witness on cross-examination tends to connect him directly with the cause or the parties, and second, where the cross-examination is as to matter tending to show motive, temper, disposition, conduct, or interest of the witness toward the cause or parties. S. v. Patterson, 24 N.C. 346; S. v. Davis,87 N.C. 514; Cathey v. Shoemaker, 119 N.C. 424; In re Craven's Will,169 N.C. 561. It is clear that the testimony of the defendant elicited on cross-examination is not within either of the exceptions to the general rule, since its sole purpose was to disparage and discredit the witness."
The answers of Nina Hunter to the collateral matters on cross-examination were conclusive. At least, on this record the exclusion of such evidence was not prejudicial or reversible error. The matter was largely in the discretion of the court below.
For the reasons given, in the judgment of the court below there is
No error. *Page 414